

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) CROSSLAND HEAVY CONTRACTORS, INC. )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>(1) JERRY'S DOCK CONSTRUCTION, INC., )<br>)<br>Defendants. )<br>) | **FILED**<br>OCT 24 2014<br>Phil Lombardi, Clerk<br>U.S. DISTRICT COURT<br><br>Case No.<br><br>**14 CV -643 TCK - PJC** |

## COMPLAINT

Plaintiff Crossland Heavy Contractors, Inc. for its Complaint against Defendant Jerry's Dock Construction, Inc. alleges and states:

### PARTIES

1. Plaintiff Crossland Heavy Contractors, Inc. ("CHC" or "Plaintiff") is a Kansas corporation having its principal place of business in Columbus, Kansas.

2. Defendant Jerry's Dock Construction, Inc. ("JDCI" or "Defendant") is an Oklahoma corporation, and on information and belief, has its principal place of business in Bernice, Oklahoma.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter under pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Venue is appropriate in this district under 28 U.S.C. § 1391 because the facts and events giving rise to the claims set forth herein occurred in this judicial district.

{1300665;}

## FACTS

5. Plaintiff CHC was hired as the general contractor to perform certain improvements to the water treatment plant ("WTP") for the Grove Municipal Services Authority in Grove, Oklahoma (the "WTP Improvements").

6. The WTP receives raw water from Grand Lake through a floating intake pump platform and walkway ("Floating Intake Structure") located near Honey Creek State Park and processes the raw water into potable water for use by the City of Grove. The Floating Intake Structure uses a series of electric pumps to provide raw water to the WTP and is the only source of raw water for the WTP.

7. Plaintiff CHC entered into a subcontract with Defendant JDCI to replace the existing foam flotation on the Floating Intake Structure ("Subcontract").

8. Approximately one week prior to commencing work, Defendant JDCI visited the site where the Floating Intake Structure was located to assess the project and elected to return at a later date with different equipment.

9. At or about 3:00 p.m. on May 27, 2014, Defendant JDCI attempted to replace the existing foam flotation under the Floating Intake Structure by lifting the Floating Intake Structure utilizing two A-frame cranes installed on two barges.

10. Shortly thereafter, one of the cables connecting one of the cranes to the Floating Intake Structure failed causing the Floating Intake Structure to fall into the water and sink. As the Floating Intake Structure sank, the second crane on the second barge remained connected to the Floating Intake Structure and was capsized, thereby causing two employees of Defendant JDCI who were performing the work to be thrown into the water.

{1300665;}                                    2

11. Plaintiff CHC and officials from the Grove Municipal Services Authority ("GMSA") immediately initiated an emergency response upon learning of these events.

12. With the sinking of the Floating Intake Structure, the supply of raw water to the WTP was cut off and the WTP was unable to create additional supplies of potable water for the GMSA. As a result, the GMSA was forced to issue a mandatory water rationing order for all Grove water customers.

13. In addition, due to the submersion of the Floating Intake Structure and barge, the Grand River Dam Authority was required to place a containment boom around the area to prevent environmental damage.

14. By the early morning hours of May 28, 2014, CHC and the GMSA had established an emergency supply of raw water to the WTP using a city fire truck to pump raw water to the WTP to keep it operational.

15. After establishing the emergency water supply to the WTP, CHC initiated a series of actions to create an alternative supply of raw water to the WTP until the Floating Intake Structure could be retrieved, repaired or replaced and placed into service.

16. By approximately 9:30 p.m. on May 28, 2014, CHC established an alternative supply of raw water to the WTP utilizing a new barge, temporary water lines, newly established electrical service, and a 150 horsepower vertical turbine pump that was placed on the barge. At that point, the city fire truck was no longer necessary to pump raw water to the WTP.

17. The following day CHC hired a diver to investigate the condition of the Floating Intake Structure and the capsized barge.

18. CHC subsequently brought in additional personnel and equipment, including a land-based crane, to retrieve the Floating Intake Structure, assess the damage and replace or begin making repairs to the Floating Intake Structure and related equipment and structures.

19. On June 11, 2014, Plaintiff CHC provided notice to Defendant JDCI that it was terminating the Subcontract and engaging other subcontractors to correct the deficiencies created by Defendant JDCI.

## CLAIMS FOR RELIEF

### Breach of Contract

20. CHC incorporates by reference paragraphs 1-19 as if fully restated herein.

21. Defendant JDCI breached the Subcontract with CHC by, *inter alia*:

   a. Failing to perform the work in compliance with Article 3 of the Subcontract;

   b. Failing to provide competent supervision in contravention of section 3.2 of the Subcontract;

   c. Failing to perform the work in a safe and reasonable manner in contravention of sections 3.14.1 and 3.14.4 of the Subcontract;

   d. Failing to implement proper safety procedures to protect employees and others from injury loss or damage in contravention of section 3.14.1.1 and 3.14.4 of the Subcontract;

   e. Failing to properly protect the Subcontract work and the work of others from damage caused by the Subcontractor's operations in contravention of section 3.14.9 of the Subcontract; and

   f. Creating an emergency situation that has resulted in damage to the Owner's property, third party property and significant additional costs to the project.

22. Defendant JDCI's breaches caused CHC to suffer damages in excess of the amount required for diversity jurisdiction, damages which are continuing to accrue as CHC completes the work specified under the Subcontract.

## Negligence

23. CHC incorporates by reference paragraphs 1-22 as if fully restated herein.

24. Defendant JDCI owed a duty to CHC to properly perform the work as described in the Subcontract.

25. Defendant JDCI breached its duty of care and was negligent in at least the following ways:

   a. Failing to properly plan for, engineer and execute the lifting of the Floating Intake Structure to replace the existing foam flotation;

   b. Failing to perform the work in a safe and reasonable manner;

   c. Failing to implement proper safety procedures to protect people and property from injury, loss or damage;

   d. Failing to properly train and supervise its employees;

   e. Other breaches to be identified through discovery and shown at the time of trial.

26. Defendant JDCI's breaches were the direct and proximate cause of the damages suffered by CHC.

## Res Ipsa Loquitor

27. CHC incorporates by reference paragraphs 1-26 as if fully restated herein.

28. CHC invokes the doctrine of res ipsa loquitor.

{1300665;} 5

29. Sinking a floating dock structure like the Floating Intake Structure and capsizing a barge while replacing foam flotation under the dock are events which ordinarily do not occur in the absence of someone's negligence.

30. At the time of the sinking of the Floating Intake Structure and capsizing of the barge, Defendant JDCI had exclusive control over the barges and equipment being used in the process, and was acting within the scope of its employment under the Subcontract.

31. CHC did not contribute to the sinking of the Floating Intake Structure, capsizing of the barge, or any damage to structures or equipment that resulted therefrom.

32. Defendant JDCI's negligence was the proximate cause of the damages suffered by CHC.

## Indemnity

33. CHC incorporates by reference paragraphs 1-32 as if fully restated herein.

34. Pursuant to Section 9 of the Subcontract, Defendant JDCI owes a duty to indemnify and hold harmless CHC:

> **9.1.1. INDEMNITY.** To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Contractor, the Contractor's other subcontractors, the Architect/Engineer, the Owner and their agents, consultants and employees (the Indemnities) from all claims that may arise from any breach, violation or default by contractor or its employees, agents, representatives, Subcontractors, or Sub subcontractors, or any employees, agents, representatives or contractors of any foregoing, of contractors obligations under the contract documents including, without limitation, any violation of any law, statute, ordinance, order, rule or regulation, including, without limitation, any Environmental Law . .

35. In the event that CHC is held liable for any damages resulting from Defendant JDCI's breaches described herein, CHC would thereupon be entitled to be fully indemnified by Defendant JDCI for any and all such damages, judgments, attorneys' fees, and related costs and expenses associated therewith.

## PRAYER FOR RELIEF

Based on the foregoing allegations, Crossland Heavy Contractors, Inc. prays that the Court enter judgment in its favor and against Jerry's Dock Construction, Inc. in an amount equal to CHC's damages, plus attorney's fees and costs, and that the Court grant such other and further relief as it deems just.

Respectfully submitted,

_____
David E. Keglovits, OBA #7563
Robert J. Carlson, OBA #19312
**GABLEGOTWALS**
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, Oklahoma 74103-4217
(918) 595-4800
(918) 595-4990 (fax)
*Attorneys for Crossland Heavy Contractors, Inc.*